Illinois Central R. R. Co. v. Henry J. Leiner, Adm'r.

1. WILLFUL NEGLIGENCE—*Defined.*—The true conception of willful negligence involves a deliberate purpose not to discharge some duty, necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed upon the person by operation of law. Thompson's Commentaries on the Law of Negligence, Vol. 1, Sec. 20.

2. SAME—*High Rate of Speed.*—Running a train at from fifteen to eighteen miles an hour in a place where there was, to the knowledge of defendant's servants, likelihood of a prior occupancy by another train,

can with full propriety be called a willful determination not to perform a known duty, particularly when the engineer knew that he had a heavy train pulled by two engines and that he was running on a down grade.

3. PRACTICE—*General Issue Admits Sufficiency of Counts of the Declaration.*—By pleading the general issue, or not guilty, which is the same thing in substance, the defendant admits the sufficiency of the counts of the declaration, and he can not afterward question them by motion to exclude the evidence. If the counts were bad, the defendant should either demur to them or move in arrest of judgment upon them.

4. SAME—*One Good Count Sufficient.*—Whenever an entire verdict shall be given on several counts, the same shall not be set aside or reversed on the ground of any defective count, if one or more of the counts in the declaration be sufficient to sustain the verdict.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of St. Clair County; the Hon. WILLIAM HARTZELL, Judge presiding. Heard in this court at the February term, 1902. Affirmed. Opinion filed September 11, 1902.

Statement.—Appellee brought this action on the case against appellant, to recover of it, damages, for negligently causing the death of appellee's intestate. The case was tried by a jury, who returned a verdict for the plaintiff below for the sum of $5,000, on which the court rendered judgment, after overruling a motion by appellant for a new trial, and also a motion by it to arrest the judgment, to each of which rulings defendant excepted and has brought this appeal.

The substantive facts of the case are : William A. Wing, the deceased, was a freight conductor on appellant's railroad, and resided at Sparta, in Randolph county, about forty miles southeasterly from East St. Louis. The end of his run, where he took his train and to which he brought it, was East St. Louis.

In the early evening of Saturday, January 11, 1901, after he had brought his train into East St. Louis, at the end of his run for that day, he desired to be relieved and go to his home, and it being the custom of the railroad company to furnish its employes free transportation in such cases, he applied to the telegraph operator at East St. Louis, to get him a telegraphic pass to Coulterville, a short distance

from Sparta. The dispatch for a pass had to go to the trainmaster's office at Carbondale, and on account of a change of operators at East St. Louis in the evening, the pass did not get into the hands of deceased until 8:58 P. M. It directed the conductor of train No. 203, to "carry conductor Wing, East St. Louis to Carbondale, and get regular transportation at my office," and was properly signed. Train No. 203 was a regular passenger train which left the relay station at 9:04 P. M., but for some unexplained reason, Wing did not take it, but instead he went to the conductor of freight train No. 255, which was scheduled to leave East St. Louis for Carbondale at 10 o'clock P. M., and which was not allowed by the rules of the road to carry him, except by special permission of the division superintendent. He told the conductor that he had transportation to ride on his train to Coulterville. The conductor told him to go to the caboose and "make himself comfortable," and he would wake him up at Coulterville.

After the train was ready to start, the conductor went to the caboose and found the deceased asleep. He continued to sleep until the train reached Belleville at 3:20 A. M., January 12th. The conductor did not ask him for his transportation, as he did not desire to disturb him. The train was a long, heavy one, and the conductor and engineer knew before leaving East St. Louis, that an extra freight train was to leave that city and follow No. 255, at 2:30 of the morning of the 12th. Train No. 255 was compelled to double the hill between East St. Louis and Belleville, and on account of the delay, the water in the engine was exhausted and the engineer was compelled to leave his train before arriving at Belleville and go there for water. Two or three minutes before the train stopped at Belleville depot, the conductor, who was riding in the caboose with one W. E. Ring, his rear brakeman, and deceased, informed the brakeman of the 2:30 train that was to follow them and directed him to keep his "eyes open," and the conductor then went forward, on the top of the train. As soon as the train stopped the conductor and engineer

went into the office to get orders and sign the register. After they received their orders and were in the act of starting, at 3:40 A. M., their train was run into by the extra train, and brakeman Ring and conductor Wing were instantly killed. The extra train was long and heavy, and drawn by two engines.

When the extra train reached the crown of the hill, about three hundred feet from the city limits, it was running at the rate of about thirty miles per hour. As soon as it started down grade the engineer in charge of the front engine, and who had control of the train, applied the air brakes and continued to make such applications until the engine reached Centreville avenue, about fifteen or sixteen hundred feet from train 255, when the engineer discovered that there was a train standing on the track. The train was then running at the rate of about twenty miles per hour; he immediately reversed his engine, continued to apply the air brakes and whistled for the hand brakes to be applied. The conductor in charge of the train at once applied the hand brakes. They were, however, unable to prevent a collision. The train was running at the rate of fifteen miles an hour when the collision occurred. The grade from Centreville avenue to the depot was about one per cent. On account of a curve in the track a train coming from the northwest can not see a train standing at the depot until it reaches Centreville avenue. The rules of the company provide that when a train is detained at a station for more than ten minutes, where the rear of the train can not be plainly seen from a train moving in the same direction for a distance of one-half mile, a flagman must go back a distance of 3,600 feet and protect the train.

Rule B 8 provides, " Second and inferior class trains must run carefully through the yard limits at Belleville, expecting to find main track occupied. In case of accident, the responsibility rests with the approaching train." Extra trains are of inferior class.

The ordinances of the city of Belleville provide that freight trains shall not be run through the city at a greater rate of speed than six miles per hour.

Train No. 255 did not flag the extra train. The usual running time of freight trains from East St. Louis to Belleville is one hour. The city of Belleville contains 20,000 inhabitants. It is 4,157 feet from the Belleville & Southern depot, where the collision occurred, to the western limits of the city, in the direction of East St. Louis. From these limits to this depot, there is a fall in grade of over thirty-nine feet. At 1,523 feet west of the depot, there is a sharp curve in the road and on account of this curve and the houses adjacent thereto, it is impossible to see a train at the Belleville & Southern depot, until the curve is reached. There is a fall of one foot in each 100 feet, from the curve to the depot. The Belleville & Southern Railroad is operated by appellant, as a part of its system.

KRAMER, CREIGHTON & SHAEFFER, attorneys for appellant; JOHN G. DRENNAN, of counsel.

M. W. BORDERS, attorney for appellee.

MR. PRESIDING JUSTICE BIGELOW delivered the opinion of the court.

The declaration contains ten counts but none of the counts were demurred to, and by defendant's plea of not guilty, issue was joined on all the counts, and at the close of the evidence, appellant's counsel moved the court to exclude all of the evidence from the jury and to instruct the jury to return a verdict finding the defendant not guilty, but the court denied the motion and the defendant excepted.

Appellant's counsel have assigned nine errors on the record, but the principal error that has been argued, is the refusal of the court to take the case from the jury, by directing it to find the defendant not guilty.

That the railroad company had the right to classify its trains and exclude all persons from riding on its freight trains without a special permit by an officer of the company, can not be denied, and that deceased knew that the pass he had received did not authorize the conductor of

freight train No. 255 to carry him to Coulterville or any other station, and hence that he was wrongfully on the train where he met his death, can scarcely admit of a doubt, whatever may be said of his intention, or of the intentions of the conductor of the train on which deceased was riding.

Rules in regard to the management and running of railroads, like the laws enacted by the state, must be obeyed, or anarchy and destruction speedily follow; hence we are unable to hold that the judgment can be sustained on any of the counts in the declaration in which it is not alleged that deceased's death was caused by the reckless, wanton and willful acts of the servants of appellant; and this brings us to the real question litigated in the case.

It is alleged in the first count of the declaration that the servants and employes of defendant in charge and control of the train on which deceased was riding, well knowing that he was there, " carelessly, negligently, recklessly and wantonly failed and omitted to flag and stop" the extra train, and that the extra train was negligently, recklessly and wantonly, run and driven at a high and dangerous rate of speed, to wit, "thirty miles an hour," into the yard limits of the defendant and within the limits of the city of Belleville, in violation of good railroading, and the rules of the defendant, and of an ordinance of the city, and that in consequence of the gross negligence, recklessness and wantonness of the defendant's servants in charge of the two trains, the trains collided and killed deceased.

The second count is substantially the same as the first count.

It is alleged in the third count that the servants and employes of the defendant in charge of the regular train, willfully failed and omitted to flag and stop the extra train, and that on account of the willfulness of defendant's servants in charge of the extra train in running and driving it in the yard limits of the city of Belleville at a high and dangerous rate of speed, in violation of the rules of the railroad, and of the ordinances of the city, the trains col-

lided, whereby deceased was killed, and that said willful acts directly contributed to his death.

Some of the remaining counts are substantially the same as the first two counts, but it is unnecessary to refer to them in further detail.

The chief difficulty in the disposition of this case relates to the question whether there is evidence tending to prove that the conduct of the defendant and that of its servants amounted to a willful injury, as we understand appellee's counsel it is conceded by him that deceased was to all intents and purposes, a trespasser on the train where he was killed.

The views of courts in different jurisdictions are not entirely agreed upon what constitutes a willful injury. In Alabama the view seems to be entertained that "an injury can not be said to be wantonly inflicted so as to obviate the effect of contributory negligence, unless the circumstances and conditions known to the person responsible for the act or omission complained of, are such as to make it likely or probable that his conduct will result in injury, and he consciously and wantonly does a wrongful act or omits to do a proper and necessary act." Thompson's Commentaries on the Law of Negligence (2d Ed.), Vol. 1, Sec. 208. And something of this view of the law was applied in the case of C. & W. I. R. R. Co. v. Surowieski, 67 Ill. App. 682, where the plaintiff attempted to climb between the cars of a train which blocked the crossing, and in the attempt was injured by the movement of the train; it was held that unless the defendant's servants knew that the plaintiff was in a dangerous position when the cars were moved, the conduct of the defendant could not be denominated reckless or wanton. But we do not understand from that opinion or from the decisions of our Supreme Court, that conscious and aggressive wrongdoing with respect to a known situation are the only distinctive ingredients in willful injuries. In a case where the locomotive of the defendant was run at a high and dangerous rate of speed, without headlight, without ringing the bell, and in a place

where numbers of people were likely to be, and injury resulted, the Supreme Court said :

" Such acts would be liable to the construction of being in wanton and willful disregard of the rights of the public generally, so as to amount, in law, to wanton and willful negligence. And it was not necessary, in order to raise an inference of such negligence, to prove that the defendant's servants were actuated by ill-will directed specifically toward ·the plaintiff, or to have known that he was in such position as to be likely to be injured." East St. Louis Connecting Railway Co. v. O'Hara, 150 Ill. 580.

In C. & W. I. R. R. Co. v. Surowieski, 67 Ill. App., *supra*, it is said that wantonness or recklessness is " such a disregard of duty, as evinces an utter indifference to duty or the rights of others." Willful negligence has been defined by a learned text writer to be, " a willful determination not to perform a known duty." Thompson's Commentaries on the Law of Negligence (2d Ed.), Vol. 1, Sec. 21. Again, " The true conception of willful negligence involves a deliberate purpose not to discharge some duty, necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed upon the person by operation of law." Id., Sec. 20. And again : " An entire absence of care for the life, the person or the property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness, such as charges the person whose duty it was to exercise care, with the consequences of a willful injury." Id., Sec. 22.

Tested by these rules we are unable to say that the court erred in the refusal to take the case from the jury, or that the jury found wrongfully against the defendant on that part of the charge of the court, which, at the instance of the defendant, by its instructions submitted the question of the defendant's willfulness to the jury. From the defendant's own rules, it is manifest that the main track in Belleville is generally occupied, and rule No. B 8, is based upon a recognition of that fact. The engineer who controlled the train which committed the injury, testified that he knew

the rule; hence the inference is irresistible that he knew of the general conditions which necessitated the rule, that is, the fact of a likelihood that the track on which he was running was occupied. Under such circumstances the rule imposed the same duty that the law required; he "must run carefully through to yard's limits." The likelihood that the main track in the yards of Belleville would be occupied, had been brought to the engineer's attention both from his experience and from his knowledge of the rule above referred to. The evidence of the servants of the defendant is, that they were running thirty miles an hour, when they came within the limits of the city of Belleville, and at the time the injury was committed, the speed was fifteen to eighteen miles an hour, and such speed was only reduced to that point after the engineer had attempted to get control of the train while it ran from the curve in the track to where the collision occurred, some 1,500 or 1,600 feet. Such a speed maintained in a place where there was, to the knowledge of defendant's servants, the likelihood of a prior occupancy by another train, can, with full propriety, be called " a willful determination not to perform a known duty," particularly when the engineer knew that he had a heavy train pulled by two engines and that he was running on a down grade. In that connection reference is made to the fact that Ring, the brakeman on train No. 255, neglected to obey the rule which required him to flag when his train had been ten minutes at the station, thereby inducing the engineer to believe that there was a clear track. If the rules of the defendant have anything to do with the question at issue, then the engineer also knew that rule B 8 declared that "in case of accident, the responsibility rested with the incoming train." In other words, the absence of signals, whether lights or torpedoes, in this particular place, was in no sense an assurance that the track was clear. With or without signals, knowing the general condition of the track as to probable prior occupancy, it was his manifest duty to regulate his conduct as to the timely control of his train, with reference to that principal fact, for aught that is contained in the rules of the defendant.

I. C. R. R. Co. v. Leiner.

It is, no doubt, to be admitted, that the engineer did everything in his power to stop the train and avert injury, and that he probably had reasonable grounds to believe that he would be able to stop the train after he became actively aware that there was impending danger. But when a person gauges a situation so closely, in a frequented place, that it becomes a matter of mere judgment with him whether he shall be able to perform a well known duty, such fact can not be accepted as more than a mere rebutting circumstance on the main issue of willful negligence. The constructive willfulness set in motion is operating, nevertheless, and the consequences are the same as if there was an unqualified intention to commit the particular injury.

It is not urged that the court committed any error in the admission or exclusion of evidence, nor is any complaint made of the giving of improper instructions on behalf of the plaintiff; since none were asked, none were given.

The defendant presented to the court twenty-three instructions, the first twelve of which were given as asked, and which put the law of the case intelligently, fairly and completely, before the jury. Of the remaining eleven, the thirteenth instruction, except as to numbers, is a sample of all the others, and it is as follows:

" 13. The court instructs the jury to disregard the testimony as to the first count in the declaration."

By pleading the general issue, (or " not guilty," which is the same thing, in substance,) the defendant admitted the sufficiency of the counts of the declaration and he could not afterward question them by motion to exclude the evidence. If the counts were bad, the defendant should either demur to them or move in arrest of judgment upon them. Chicago, Burlington & Quincy Railroad Company v. Warner, 108 Ill. 538. The instructions were properly refused. Section 57 of the Practice Act is as follows:

" Whenever an entire verdict shall be given on several counts, the same shall not be set aside or reversed on the ground of any defective count, if one or more of the counts in the declaration be sufficient to sustain the verdict."

Several of the counts of the declaration to which the evidence could apply, were certainly sufficient to sustain the verdict, and hence appellant's motion in arrest of the judgment was properly overruled.

We have fully considered all of the questions raised in the case, and find no error in the record for which the judgment should be reversed, therefore it is affirmed.